IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

| | | |
|---|---|---|
| SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:10CV310KS-MTP |
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

AFFIDAVIT
OF
MARCUS WARE, P.E.

MARCUS WARE, being duly sworn on oath, deposes and states as follows:

1. My name is Marcus Ware. My business address is 7037 U.S. Highway 49, Hattiesburg, Mississippi. I am more than twenty-one years of age and I have personal knowledge of the facts set forth in this Affidavit.

2. I am now, and at all relevant times have been, employed by South Mississippi Electric Power Association ("SMEPA"). My current title is Assistant General Manager.

3. My responsibilities at SMEPA have included direct involvement in the negotiation and administration of SMEPA's coal supply and coal transportation contracts.

4. SMEPA's Plant Morrow is a coal-fired generating station that is located near Richburg, Mississippi. Plant Morrow consists of two units, each of which is rated at 200 megawatts. Historically, these two units have consumed approximately 800,000 to 1,000,000 tons of coal per year.

EXHIBIT 1

1

5. Plant Morrow is one of SMEPA's primary generating resources for purposes of producing the electricity that SMEPA distributes to its eleven Member-owned electric power associations. SMEPA's Members in turn serve approximately 411,000 homes and businesses in fifty-six of Mississippi's eighty-two counties. SMEPA's service territory comprises nearly two-thirds of the state's land mass. Given the status of Plant Morrow as a primary generating resource, maintaining a reliable and consistent source of coal supply for the facility is critical to SMEPA's continued reliable operation.

6. Since commercial operation began at Plant Morrow in 1978, all of the coal that has been consumed has been delivered via railroad. Norfolk Southern ("NS") is the only rail carrier that is capable of providing this service to Plant Morrow.

7. For many years, all of the coal shipped to Plant Morrow has been delivered by NS pursuant to coal transportation agreements. SMEPA acquired a fleet of railcars, which we provide to NS for use in delivering coal to Plant Morrow. The economics associated with this fleet of railcars is a key component in SMEPA's commercial dealings with NS. The efficiency of the service provided to SMEPA by NS impacts these economics, as slower service limits the amount of coal tonnage that NS can deliver with the available equipment.

8. SMEPA and NS have operated under a series of coal transportation agreements, the second of which expired in December of 2003. I was involved in the negotiation and administration of the succeeding agreement, which became effective in January 2004 ("2004 Agreement).

9. While the rates NS charged SMEPA for coal transportation prior to 2004 had been very favorable, NS took the opportunity in 2004 to impose significant rate increases on

2

SMEPA. For example, the Base Rates for shipments from NS's Interstate District under the 2004 Agreement increased almost 60% over the expiring contract rates.

10. In addition to the 60% Base Rate increase, the 2004 Agreement incorporated various NS tariffs, including one that subjected SMEPA to a percent-of-rate fuel surcharge. This fuel surcharge was in addition to a provision that required quarterly adjustments based on 80% of the change in the cumulative percentage change in the Gross Domestic Product – Implicit Price Deflator (the "GDP-IPD Index") from one quarter to the next, as approved by the Surface Transportation Board ("STB"). The GDP-IPD Index was designed to index changes in various cost components of the railroad's services, including a component relating to fuel. This index (adjusted to 80%) was applied quarterly to 100% of the rate. The use of a percentage of the index was intended to operate as a vehicle for SMEPA to share in any productivity gains experienced by NS under the 2004 Agreement.

11. SMEPA objected to the incorporation of the fuel surcharge in the 2004 Agreement, particularly because it was applied on top of an adjustment provision that already compensated NS for its fuel costs. NS, however, was unyielding in its insistence that the fuel surcharge needed to be applied to any SMEPA coal shipments. Given NS's monopoly over destination deliveries, SMEPA had no choice but to enter into the 2004 Agreement or lose rail service coal delivery to Plant Morrow.

12. During the term of the 2004 Agreement, it was apparent to SMEPA that NS's fuel surcharge was over-recovering NS' fuel cost increases. SMEPA was not alone in this view. The issue ultimately became the subject of a Surface Transportation Board proceeding on the subject of railroad practices relating to fuel surcharges that was designated as *Rail Fuel Surcharges,* Ex Parte No. 661.

3

13. SMEPA submitted Comments in the STB fuel proceeding as part of a group known as the Concerned Captive Coal Shippers. These Comments were appended as Exhibit 1 to NS' Motion to Dismiss. The Concerned Captive Coal Shippers Comments asked the STB to rule that the railroads' use of percent-of-rate fuel surcharges were "unreasonable practices" because the fuel surcharges bore no relationship to cost recovery of actual fuel cost increases. The Comments also asked the STB to declare the railroads' use of adjustment clauses with a fuel component an unreasonable practice due to the "double-dip" that results from application of a fuel surcharge on top of an adjustment clause that already includes a fuel component.

14. The 2004 Agreement expired by its terms in December 2006. SMEPA and NS agreed to a new coal transportation agreement that became effective January 1, 2007 ("2007 Agreement"). I was involved in the negotiations of the 2007 Agreement and was also involved in its administration throughout its term.

15. NS again took advantage of the expiring contract as an opportunity to extract huge rate increases from SMEPA. SMEPA's initial Base Rates for service from NS's Interstate District under the 2007 Agreement represented an increase of over 40% from the expiring contract rates.

16. NS also was unrelenting in its insistence that the 2007 Agreement include a fuel surcharge provision. NS was clear that the inclusion of a fuel surcharge was a non-negotiable issue, and SMEPA was left with no choice but to agree to its inclusion in the agreement (subject to the rights preserved by Section 11) or potentially lose rail service to Plant Morrow.

17. The 2007 Agreement included a quarterly adjustment provision that adjusts the Base Rates based on 90% of the percentage change in the Rail Cost Adjustment Factor (Unadjusted) ("RCAF-U") from one quarter to the next quarter, as published by the STB. Again,

the use of a percentage of the index was intended to allow some sharing of any productivity gains made by NS that are not reflected in the RCAF-U.

18. On January 25, 2007, the STB issued a decision finding that percent-of-rate fuel surcharges, like the one NS charged SMEPA under Section 15 of the 2007 Agreement, were an unreasonable practice because they were based on a misrepresentation that the surcharge bore some relationship to recovery of increased fuel costs. Rail Fuel Surcharges, Ex Parte No. 661 (STB issued January 25, 2007) (*"Fuel Decision"*). The STB's *Fuel Decision* further concluded that imposing percent-of-rate fuel surcharges on top of rates that are adjusted using adjustment indexes which include a fuel component is an unreasonable practice because it allows the railroad to "double-recover" its fuel costs. *Id.*

19. Upon learning of the *Fuel Decision,* SMEPA advised NS that Section 11 of the 2007 Agreement required that the Section 15 fuel surcharge provision in said 2007 Agreement be nullified. The parties continued to have discussions about the effect of this decision and ultimately reached an impasse.

20. SMEPA continued to make payments on the fuel surcharge despite the parties' dispute over the fuel surcharge for several reasons. First, the payment provisions in NS Conditions of Carriage, a publication incorporated into the 2007 Agreement by Section 10, allows SMEPA to make payments in full and seek refunds within the statute of limitations. Accordingly, SMEPA believed that making payments did not prejudice the right to seek refunds at a later date.

21. Second, SMEPA had grave concerns that exercising self-help under the 2007 Agreement and terminating payment of fuel surcharges would result in retribution from NS. As the sole carrier capable of delivering coal to SMEPA's plant, NS has significant control on

5

SMEPA's operations. Since Plant Morrow's operational success is critical to SMEPA's overall operations, SMEPA cannot afford to have its deliveries to Plant Morrow compromised for any reason.

22.     SMEPA witnessed a disturbing trend in NS service performance as compared to SMEPA's transportation rates. While rate levels have steadily increased over the past decade, NS's rail service to Plant Morrow has steadily declined.

23.     By way of illustration, one of the key measures that SMEPA monitors to measure service is the "cycle time" of SMEPA trainsets (engine and approximately 103 cars). The cycle time for a trainset is the amount of time it takes for said trainset to travel from the point of loading at the coal mine, travel to Plant Morrow, unload the coal, and return to the coal mine for re-loading. Typically, SMEPA's trainsets can deliver approximately 12,000 tons per train. The faster the trains cycle, the more efficiency SMEPA experiences for its railcar fleet.

24.     Early in SMEPA's history of rail deliveries to Plant Morrow, the cycle times for SMEPA trainsets were typically 4.5 days. At the time SMEPA entered the 2004 Agreement, cycle times were averaging roughly 6.9 days in 2003 (the year during which the 2004 Agreement was negotiated). That cycle time continued to rise during the 2004 Agreement reaching nearly 9 days in 2006 (the last year of the 2004 Agreement).

25.     Cycle times under the 2007 Agreement have continued to lengthen, despite the fact that SMEPA paid significantly more for the slower service. In 2010, the last year of the 2007 Agreement, cycle times were routinely averaging around 12 days.

26.     Another factor that SMEPA reviews to measure service by NS is the number of "loading permits" that NS honors. Section 20 of the 2007 Agreement details the process for scheduling shipments with NS. Through this process, NS schedules the SMEPA contract

6

deliveries and issues loading permits for each trainload that is planned to be loaded in a given month.

27. In 2008, SMEPA requested 69 loading permits and received 66 loaded trainsets (96% of the loads requested). In 2009 SMEPA requested 88 loading permits and received 85 loaded trainsets (97% of the loads requested). In 2010, during which SMEPA and NS were engaged in negotiations over expiring contract rates, SMEPA requested 69 loading permits and received only 51 loaded trainsets (74% of the loads requested).

28. NS's deteriorated service in 2010 resulted in SMEPA suffering a shortfall of approximately 130,000 tons of coal, due to missed loadings and train delays. These shortfalls were particularly troubling given that they occurred during a year in which SMEPA and NS were engaged in negotiations over transportation rate and service issues for the post-2007 Agreement period. As with earlier negotiations, NS took a heavy hand in these negotiations and requested huge rate increases and diminished service assurances. The negotiations eventually failed and NS published common carrier tariff rates have applied to SMEPA shipments since January 1, 2011. These tariff rates on shipments from the Interstate District represented an increase of approximately 48% on top of the already high base rates that SMEPA was paying NS at the end of the 2007 Agreement in December 2010.

29. The service which NS provided to SMEPA during the 2010 negotiations confirmed to SMEPA that exercising self-help on issues like the fuel surcharge would have resulted in retribution from NS. SMEPA had serious questions as to whether the 2010 delivery shortfalls were retribution for SMEPA failing to succumb to the NS rate demands and were intended to shift tons that should have been shipped in 2010 into 2011 so that NS could receive higher revenues on the traffic.

30. The NS delivery shortfalls in 2010 caused direct economic harm to SMEPA and its Members, as those shortfalls will need to be delivered in 2011 at the substantially higher NS tariff rates. We estimate that shipping the 2010 shortfall tons in 2011 at these NS tariff rates will result in SMEPA paying approximately $13.00 per ton in additional transportation costs when compared to the costs that should have been incurred had the coal been transported in 2010 at the 2007 Agreement rates.

Further affiant sayeth naught.

_____
Marcus Ware, P.E.

SWORN TO AND SUBSCRIBED BEFORE ME, this 9th day of March, 2011.

_____
NOTARY PUBLIC

My commission expires:

12/13/12

[Notary Seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 47400, SHANNON GILBERT COREY, Commission Expires Dec. 13, 2012, LAMAR COUNTY]